**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**Case No. _______________**

ARIZONA REGIONAL MULTIPLE LISTING SERVICE, INC.; BRIDGEMLS, INC.; CAROLINA MULTIPLE LISTING SERVICES, INC., d/b/a CANOPY MLS; METROLIST, INC., d/b/a RECOLORADO; NORTH CAROLINA REGIONAL MLS, LLC, d/b/a HIVE MLS; TRIANGLE MLS, INC., d/b/a DOORIFY, MLS,

Plaintiffs,

v.

COMPASS, INC.,

Defendant.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Arizona Regional Multiple Listing Service, Inc. ("ARMLS"); BridgeMLS, Inc. ("BridgeMLS"); Carolina Multiple Listing Services, Inc., d/b/a Canopy MLS ("Canopy MLS"); Metrolist, Inc., d/b/a REcolorado ("REcolorado"); North Carolina Regional MLS, LLC, d/b/a Hive MLS ("Hive MLS"); and Triangle MLS, Inc., d/b/a Doorify, MLS ("Doorify MLS") (collectively, the "MLS Parties") file this Complaint against Defendant Compass, Inc. ("Compass") and state as follows:

## INTRODUCTION

1. This lawsuit arises from a campaign by Compass—the largest real estate brokerage in the United States—to pressure multiple listing services ("MLSs") into changing cooperation rules in a way that would favor Compass but would make the market for residential real estate less transparent and less competitive, ultimately hurting consumers.

2. At its core, an MLS is a cooperative collective of real estate brokers in a particular geographic area. Although the brokers compete with one another to represent buyers and sellers of homes, they agree to coordinate through the MLS for a limited purpose—to create a comprehensive database of accurate, timely information about real estate listings that no individual broker could create. This comprehensive database offers substantial benefits not only to all brokers in the area, but also to all potential buyers and sellers of homes in that area: It helps buyers identify available properties, and it provides market data that guides sellers in setting prices and buyers in making offers.

3. A brokerage, like Compass, that wants access to this comprehensive database of information joins the MLS and agrees to its rules. One such rule requires cooperation from a broker if that broker wants access to the comprehensive database ("Cooperation Rules"). The Cooperation Rules are simple. Any property that is marketed to the public must be entered into the MLS so it becomes part of the database of listings made available to all MLS members and thus all consumers.

4. These rules protect the fundamental purpose of the MLS—to establish and maintain a comprehensive database of accurate and timely information about real estate listings in an area. If brokers could use the MLS database to find properties for their buyer-clients while simultaneously withholding their own listings, the database would become incomplete and lose its value. The Cooperation Rules prevent such free riding and protect the core function of the MLS.

5. Compass wants to have its cake and eat it too. Compass wants to continue to benefit from the listings that competing brokerages enter into the MLS, but Compass wants to unilaterally decide what information it puts into the MLS and when it puts that information into

the MLS, thereby limiting the information available to brokers and the consumers they represent. By doing so, Compass threatens the very value of the MLS as a comprehensive source of accurate, timely information about real estate listings. This may benefit Compass and its strategy of leveraging its market power to wield its substantial inventory of for-sale properties as a weapon to drive smaller brokerages out of business, but it would diminish competition among brokerages and reduce options for the buyers and sellers of residential real estate.

6. Compass frames its practice of withholding listings from the MLS in terms of "seller choice," but this is doubly wrong. First, the real estate market is a two-sided market, and MLS members represent not only sellers of property, but also the thousands of potential buyers. The Cooperation Rules ensure that potential buyers have accurate and timely information about real estate listings. Second, the reality is that sellers have significant options for how to market their properties that do not undermine the MLS cooperative. If a seller desires privacy, the seller may refrain from publicly marketing a property; in this circumstance, the broker is not required to enter information about the listing into the MLS. The MLS Parties also offer sellers several middle-ground options that vary by MLS, including a "Coming Soon" option that allows a broker to "test the waters" on a listing before it becomes active, and a "Limited Exposure" option that allows a seller to publicly market a listing in all ways except the Internet, thereby enacting some control over how information about the property is disseminated. But what a broker representing a seller may not do is market a home to the public while hiding it from fellow MLS members.

7. Compass has made both public and private statements that it intends to file federal antitrust litigation against any MLS that continues to enforce its Cooperation Rules. The MLS Parties all received fundamentally identical demand letters from Compass stating expressly that

Compass would file suit against them unless the MLS Parties confirmed in writing that they would no longer enforce their Cooperation Rules (the “Demand Letters”). Since sending the Demand Letters, Compass has sued another MLS—the California Regional MLS—that received a substantively identical demand letter. The MLS Parties thus face an immediate choice—stop enforcing the Cooperation Rules, which could have significant collateral consequences, or face antitrust litigation seeking treble damages.

8. Faced with this imminent threat, the MLS Parties file this action seeking a declaratory judgment that their respective Cooperation Rules do not violate Section 1 of the Sherman Act, 15 U.S.C. § 1, or the state antitrust laws of Arizona, California, Colorado, and North Carolina, because the Cooperation Rules are not anticompetitive and have significant procompetitive benefits.

## PARTIES

9. Each of the MLS Parties operates a broker cooperative that provides a real-property information-sharing platform and distribution system. Real estate brokers and agents input and search for properties that are for sale, and they use the MLS listing and sale records to provide informed opinions and consulting services to their clients.

10. Plaintiff Arizona Regional Multiple Listing Service, Inc., is an Arizona corporation with its principal place of business in Tempe, Arizona. It is owned by four Arizona Realtor® associations: Phoenix Realtors®, Scottsdale Area Association of Realtors®, West and SouthEast Realtors® of the Valley, and Sedona Verde Valley Association of Realtors®.

11. Plaintiff BridgeMLS, Inc., is a California corporation with its principal place of business in Berkeley, California. It is a subsidiary of Bridge Association of Realtors®.

12. Plaintiff Carolina Multiple Listing Services, Inc., d/b/a Canopy MLS is a North Carolina corporation with its principal place of business in Charlotte, North Carolina. It is a wholly owned subsidiary corporation of Charlotte Regional Realtor® Association Inc. d/b/a Canopy Realtor® Association.

13. Plaintiff Metrolist, Inc., d/b/a REcolorado is a Colorado corporation with its principal place of business in Greenwood Village, Colorado. It is owned by MAZL, LLC.

14. Plaintiff North Carolina Regional MLS, LLC, d/b/a Hive MLS is a North Carolina limited liability company with its principal place of business in Wilmington, North Carolina. It is owned by eleven Realtor® associations and nine multiple listing services.

15. Plaintiff Triangle MLS, Inc., d/b/a Doorify, MLS is a North Carolina corporation with its principal place of business in Cary, North Carolina. It is a wholly owned subsidiary corporation of Raleigh Regional Association of Realtors®.

16. Defendant Compass, Inc., is a Delaware corporation with its principal place of business in New York, New York. Compass is a publicly traded company and the largest real estate brokerage in the United States. Thousands of real estate brokers and agents nationwide, including in New York and in the regions serviced by the MLS Parties, are affiliated with Compass, and many are members of one or more of the MLS Parties.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Compass's threatened action presents a substantial question of federal antitrust law under Section 1 of the Sherman Act, 15 U.S.C. § 1. This Court also has supplemental jurisdiction over the MLS Parties' state-law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy.

18. The MLS Parties seek declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. An actual, justiciable controversy exists between each of the MLS Parties and Compass. The Demand Letters set forth specific legal theories under which Compass claims that the Cooperation Rules violate the Sherman Act. Compass's Demand Letters explicitly threaten federal antitrust litigation against each of the MLS Parties unless each agrees to stop enforcing its Cooperation Rules. And this is no idle threat—Compass has already filed litigation against one MLS (California Regional MLS) that received a substantively identical demand letter. Thus, the dispute is "definite and concrete, touching the legal relations of parties having adverse legal interests," and the controversy is "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (first quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41 (1937), then quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

19. This Court has personal jurisdiction over Compass because it is incorporated in Delaware and has its principal place of business in New York. Compass is therefore subject to general personal jurisdiction in this District. Additionally, Compass conducts substantial business in New York, employs and contracts with agents who operate in this District, and directed the Demand Letters to the MLS Parties with the knowledge that the threatened litigation would affect interstate commerce, including commerce in this District.

20. Venue is proper in this District under 28 U.S.C. § 1391(b) and under section 12 of the Clayton Act, 15 U.S.C. § 22, because Compass resides in this District, a substantial part of the events giving rise to the claims occurred in this District, and Compass may be found in this District and transacts business in this District.

## FACTUAL BACKGROUND

### A. The MLS System

21. An MLS is a network of real estate professionals—including licensed real estate agents, brokers, appraisers, and other subscribers—that agree to timely and comprehensively share details and access to properties that are for sale or rent, as well as information about completed transactions, including sale prices. For more than a century, MLSs have been a cornerstone of the U.S. residential real estate market. They efficiently match home sellers with buyers and create a fair marketplace for professionals and consumers alike.

22. Residential real estate brokerage firms are among the subscribers to MLSs. Brokerages oversee and are responsible for their agents, and they provide them with training, tools, marketing materials, and other services. Real estate agents traditionally work as independent contractors rather than as employees of their brokerages.

23. The MLS serves an essential market-making function. As the Federal Trade Commission recognized in its 1983 study of the residential real estate brokerage industry (the "Butters Report"), "both sellers and buyers would be served best if they could reach all potential buyers or receive information relating to all homes for sale, through a single, convenient source." *See* FTC, The Residential Real Estate Brokerage Industry (1983), at 11, https://www.ftc.gov/system/files/ftc_gov/pdf/The-Residential-Real-Estate-Brokerage-Report--Butters-Report.pdf. The Butters Report found that the MLS "create[s] an excellent centralized source of information regarding housing values" and that the "market-making effect of the MLSs probably exceeded even the founders' expectations." *Id.* at 113.

24. Even before the Internet, the 1983 Butters Report recognized that "[m]aximizing the seller's price, the buyer's satisfaction, and the broker's profits calls for maximizing the

exposure of properties for sale." *Id.* at 37. The report also noted that one investigation had concluded that "use of the MLS doubled the probability of a property selling." *Id.* at 113. These findings further support that the MLS is procompetitive and benefits brokers and consumers on both sides of a real estate transaction.

25. At the same time, the Butters Report also identified the harm caused by "vest-pocket" listings—which is what Compass now demands of the MLS Parties. Vest-pocket listings are properties that are for sale but not submitted to the MLS. "While there may be cases where a seller does not want his or her listing submitted to the MLS, the MLS remains the most efficient method of maximizing exposure of property in large markets. Historically, however, a common problem for sellers and for the MLSs has been 'vest pocket' listings," or listings that are withheld from the MLS for reasons that advantage the broker but may disadvantage the consumer. *Id.* at 130. For example, brokers may withhold a listing from the MLS that has been priced too low because they believe they can then "obtain a sale without a cooperating broker's help" and thus keep the entire commission. *Id.* at 14. Thus, "one rationale for mandatory listing requirements traditionally has been that it helps in suppressing a practice which can do substantial injury to consumers." *Id.* at 130–31. Moreover, the Butters Report did not anticipate the more targeted campaigns of large brokerages like Compass, which has reportedly offered $1,000 payments to New York City real estate agents to remove active listings from third-party websites. *See* Katherine Clarke, *The Fierce Battle to Control How Americans Buy and Sell Their Homes*, The Wall Street Journal (Oct. 15, 2026).

26. In 2007, the FTC and DOJ issued a joint report, "Competition in the Real Estate Brokerage Industry" (the "2007 Competition Report"), that recognized that "[m]ost MLSs require that a member broker, upon acceptance of a listing, enter the listing into the MLS

database within a short period of time, *e.g.*, twenty-four to seventy-two hours." 2007 Competition Report, at 10, https://www.ftc.gov/sites/default/files/documents/reports/competition-real-estate-brokerage-industry-report-federal-trade-commission-and-u.s.department-justice/v050015.pdf. Nowhere in the 2007 Competition Report did the agencies suggest that such a mandatory submission rule was anticompetitive or unfair to participating brokerage firms.

27. To the contrary, the agencies acknowledged in the 2007 Competition Report the importance of the MLS not just to sellers and their exclusive agents but also to buyers and other brokers. Specifically, the agencies stated that buyers benefit from the MLS because they can have access to "a single source (that is, a single broker) for information regarding the vast majority of homes for sale within a given area, instead of visiting multiple brokerages to obtain such information. Access to the largest number of potentially appropriate homes for sale allows buyers to maximize their chances of finding a home that most clearly matches their desired characteristics." *Id.* at 12.

28. As the agencies readily acknowledged, "[t]he efficiencies associated with use of an MLS in the real estate industry are well documented in the real estate, legal, and economic literature." *Id.* at 13.

29. These efficiencies—and potential threats—persist into 2026. In an August 2026 letter to Compass, Senator Elizabeth Warren wrote that "listing access is crucial for healthy competition in the real estate market" and expressed concern that Compass's listing methods "have the potential to obscure key data typically used to negotiate home prices, like the number of days on the market or price change history." *See* Letter from Elizabeth Warren, Ranking Member on U.S. Senate Committee on Banking, Housing, and Urban Affairs, to Compass, Inc.,

and Midwest Real Estate Data, LLC, at 2–3 (Aug. 6, 2026), https://www.banking.senate.gov/imo/media/doc/compass_mred_letter.pdf.

**B. The MLS Parties and the Cooperation Rules**

30. The MLS Parties value their vital role in making the real estate market work efficiently, and their rules balance the interests of sellers, buyers, exclusive listing brokers, and cooperating brokers representing buyers.

31. ARMLS has approximately 36,500 subscribers and serves the entirety of Arizona, including the greater Phoenix metropolitan area, the Sedona/Cottonwood area, and the Sierra Vista area. Currently, ARMLS has over 42,000 active listings, and in 2025, its total listings were over 203,000. Its database contains more than 4.6 million historical listings.

32. BridgeMLS has more than 3,500 subscribers, and others can access its data through other MLSs via data-sharing agreements. BridgeMLS's service area covers Alameda, Contra Costa, and Tuolumne Counties in California. Currently, BridgeMLS has over 2,300 active listings, and in 2025, it had 10,600 total listings. Its database contains more than 493,000 historical listings.

33. Canopy MLS has more than 22,000 subscribers, and others access its data through other MLSs via data-sharing agreements. Canopy MLS's service area reaches Georgia, North Carolina, South Carolina, Tennessee, and Virginia, and it currently has over 30,000 active listings in 122 counties. In 2025, its total listings were over 110,000. Its database contains more than 2.6 million historical listings.

34. REcolorado serves approximately 25,000 real estate professionals, and subscribers of several other MLSs can access its platform through IntraMatrix. REcolorado serves the Denver metro region of Colorado. As of October 2026, REcolorado's database had

approximately 33,900 active listings, and in 2025, its total listings were over 116,000. Its database contains nearly 1.8 million historical listings.

35. Hive MLS has more than 19,000 subscribers and its service area reaches Alabama, Georgia, North Carolina, South Carolina, Tennessee, and Virginia. Currently, Hive MLS has over 32,000 active listings, and in 2025, its total listings were over 196,000. Its database contains more than 683,000 historical listings.

36. Doorify MLS has more than 14,000 subscribers and its service area covers 16 counties across North Carolina. Currently, Doorify MLS has over 23,000 active listings, and in 2025, its total listings were over 87,000. Its database contains nearly two million historical listings.

37. The MLS Parties each operate independently of each other as a cooperative venture—a platform for sharing and distributing real property information. Brokers and agents use it to share and search for properties for sale and to research historical listing and sales data to inform opinions on property values, make recommendations, and deliver other services to their clients. Using this information, subscribers can advise sellers on the selling process, including appropriate listing prices, which helps connect sellers with the largest possible pool of informed buyers.

38. The cooperative ensures that agents and their clients have access to current, complete, and transparent housing market data. Unlike most other items that are sold, for which there are typically interchangeable alternatives, each home is a unique, non-fungible asset based on its individual design, features, and location. The transparent data included in MLS listings such as closed sale price, days on market, and price history is thus critical for the buyer to be

able to gauge market value. Indeed, MLS data is regularly used to inform public policy as the MLS provides the most comprehensive housing data.

39. On November 11, 2019, the National Association of Realtors ("NAR") adopted the Clear Cooperation Policy as MLS Statement 8.0. Many of the MLS Parties (except for REcolorado) are affiliated with NAR and, as such, must abide by NAR mandatory rules for MLSs (like the Clear Cooperation Policy) as a condition of such affiliation.

40. The NAR Clear Cooperation Policy provides: "Within one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants." Public marketing is defined to include, among other things, "flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays . . . , digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public." NAR, MLS Clear Cooperation Policy, https://www.nar.realtor/about-nar/policies/mls-clear-cooperation-policy.

41. The MLS Parties each independently adopted rules that implemented the NAR Clear Cooperation Policy. Because each MLS Party independently proposed, considered, and adopted its individual rules, the rules vary somewhat among the MLS Parties. Generally speaking, however, each MLS Party has a rule requiring submission to the MLS once a property is publicly marketed. *See* Exhibit A, ARMLS Rule 8.0; Exhibit C, BridgeMLS Rule 7.5.1; Exhibit E, Canopy MLS Rule 1.1.2; Exhibit G, REcolorado Rule 1.0; Exhibit H, Hive MLS Rule 1.01; Exhibit I, Doorify MLS Rule 1(h). Each of the Demand Letters demanded that each of the MLS Parties stop enforcing these rules.

42. As an example, Canopy MLS Rule 1.1.2 states: "Within one (1) business day of marketing a property to the public, the Listing Brokerage must submit the listing to the MLS for cooperation with other MLS Member Participants." The rule further provides that "[p]ublic marketing includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public-facing websites, brokerage website displays (including IDX and VOW), digital communication marketing (email blasts), multi-brokerage listing sharing networks and applications available to the general public." *See* Exhibit E.

43. The MLS Parties' Cooperation Rules do not, however, apply to every property listing by a brokerage. For example, Canopy MLS Rule 1.1.2 only applies when three conditions are met: (1) the listing broker participates in Canopy MLS; (2) the broker has an exclusive right-to-sell listing agreement with the seller; and (3) the broker publicly markets the property. When all three conditions are met, the broker must submit the listing to Canopy MLS within one business day after public marketing begins.

44. To ensure that sellers have maximum flexibility and control over how their properties are marketed, the MLS Parties have each independently adopted various marketing options designed to help brokers accommodate different seller preferences. Under Canopy MLS's rules, for example, these options are clearly outlined for a seller in a form titled, "Seller Authorization for Limited Marketing." *See* Exhibit F.

a. <u>Firm Exclusive</u>. Some sellers, such as public figures, may desire a greater degree of privacy. These sellers may choose a "Firm Exclusive" listing under Canopy MLS Rule 1.2.1. *See* Exhibit E. A Firm Exclusive listing is shared only within a single brokerage. The listing agent may market the property within that brokerage and may also contact agents outside the brokerage on a one-on-one basis to try to find a buyer for the

property. To preserve the seller's privacy, no public marketing of the listing is allowed. A Firm Exclusive listing does not trigger the Cooperation Rules unless and until the listing is marketed publicly. A seller with a Firm Exclusive listing can elect whether to enter the property into the MLS or only "register" the property with the MLS but not enter it into the MLS database. But even if the seller does enter the property in the MLS, it is visible only to other agents within the listing brokerage, thus protecting the privacy of the seller.

b. Coming Soon. Canopy MLS offers sellers a "Coming Soon" status, under which the listing is submitted to Canopy MLS for cooperation, but the "listing does not begin accruing DOM [days on market] until it moves to Active status." *See* Exhibit E, Canopy MLS Rule 1.12.2(d). During Coming Soon status, the property may be publicly marketed and is visible to other Canopy MLS participants. Coming Soon status lets a seller build interest in the property while the seller or listing agent prepares it for public viewing. Because there are no showings during this status, the listing does not accrue days on market in the MLS. A property may stay in Coming Soon status for 21 days. Importantly, Coming Soon listings are visible to all Canopy MLS subscribers, keeping these properties a part of the cooperative process.

c. Limited Exposure. Canopy MLS also offers "Limited Exposure Listings" for sellers who want Canopy MLS to limit distribution of their listing to third-party websites. Under this option, sellers who may have privacy concerns can limit visibility of their listing only to other Canopy MLS subscribers. This option provides MLS participants with access to properties that meet their buyer clients' needs while respecting the seller's preference for limited public exposure. These listings are available to the MLS cooperative, but Canopy MLS does not disseminate the listing to any third-party

internet portals through syndication (such as Realtor.com), or to brokerage websites through IDX (such as Redfin.com). *See* Exhibit E, Canopy MLS Rule 1.1.3.

d. Active. Finally, listing brokers may make a listing fully "Active" without limiting exposure. An Active listing is visible to all Canopy MLS subscribers and distributed to brokerage websites through Internet Data Exchange ("IDX") and third-party portals through authorized data feeds; days on market are counted; and both the listing broker and any participant representing a buyer may show the property, subject to the seller's showing instructions.

45. The other MLS Parties also offer different marketing options designed to help brokers accommodate different seller preferences.

46. ARMLS offers sellers an "Office Exclusive" option, under which the seller directs that the property not be disseminated through the MLS and not be publicly marketed. ARMLS also offers a "Coming Soon" option, under which the listing is filed with ARMLS, public marketing through IDX and portal syndication (i.e., third-party portals, such as Zillow, Realtor.com, Homes.com, or Redfin) is delayed for up to 30 days, and days on market do not accrue, but the listing firm may otherwise market "the listing in a manner consistent with the seller's choice." Exhibit A, ARMLS Rule 8.7; *see also id.* at Rule 8.25. These features allow sellers to conduct preliminary marketing and obtain buyer feedback before broader distribution.

47. BridgeMLS likewise permits a seller to choose an "office exclusive" option, under which the seller directs the listing broker not to publicly market the property and not to disseminate it through the MLS. Exhibit C, BridgeMLS Rule 7.6.1. BridgeMLS also offers an optional "Coming Soon" status for up to 30 days, under which the listing is viewable to all MLS

participants and may be publicly marketed, but days on market do not begin to accrue until the listing becomes active. *Id.* at Rules 10.1, 10.1.1.

48. REcolorado offers a "Private Exclusive" listing path, under which the listing broker may privately market the property on a one-to-one basis and the listing is not disseminated on the MLS. Exhibit G, REcolorado Rules 1.02, 1.5. REcolorado also offers a "Coming Soon" status for up to seven days, where showings are prohibited and days on the market do not accrue. *Id.* at Rules 1.3, 1.6 & Glossary.

49. Hive MLS also permits an "office exclusive" listing for sellers who do not want a listing shared; the listing is filed with Hive MLS but not disseminated to other participants. Exhibit H, Hive MLS Rule 1.3. Hive MLS also offers an "Active - Delayed Marketing" option, under which a listing is not visible to participants or syndicated until a designated marketing date, *id.* at Rules 1.1.19(b) & 1.1.20, and a "Coming Soon - No Showings" status, under which a listing may be marketed as "coming soon" but not shown for up to 30 days. *Id.* at Rules 1.1.2 & 1.1.20.

50. Doorify MLS likewise permits a seller who does not want a listing publicly marketed or shared with other participants to direct the listing broker to take an "Office Exclusive" listing, which is filed with Doorify MLS but not disseminated to MLS subscribers. Exhibit I, Doorify MLS Rule 1.4.1. Doorify MLS also offers a "Limited Distribution" option, under which the listing is distributed to other Doorify MLS subscribers, but it is excluded from IDX and is not sent to third-party consumer-facing websites. *Id.* at Rule 1.4.2. Sellers may use this option to delay broad public marketing of their property. *Id.* Doorify MLS also offers a "Coming Soon" status for up to 14 days, with no showings or open houses. *Id.* at Rule 1.3(2).

51. Thus, although Compass claims it is protecting seller choice, the MLS Parties already provide sellers and listing agents with multiple options to market their properties. These options are critical features of the Cooperation Rules: They ensure that no seller is forced to list on the MLS.

52. The Cooperation Rules also address a serious free-rider problem that threatened the MLS's entire cooperative structure. Before the Cooperation Rules, some brokerages used the listing data that MLS participants provided while withholding their own listings from the MLS, including listings that they publicly advertised through their own websites or other channels. This permitted some brokerages to benefit from the shared data without making corresponding, timely contributions of their own publicly marketed listings, which reduced the value of the MLS Parties' core service to all other participants and the consumers they serve.

53. Compass claims that it is not free riding because it eventually contributes data for most of its listings. But the MLS system depends on both comprehensive and current data to function as intended. For example, submission after a property has sold does not restore another broker's opportunity to identify that property for an interested buyer. Thus, Compass cannot benefit from the up-to-date information submitted by other participating brokerages while only selectively submitting data or submitting outdated data. In short, the timing of the submission of the listing matters.

54. The Cooperation Rules have proven effective in practice, with an overwhelming majority of the MLS Parties' participants complying with the requirements.

55. The MLS Parties have various mechanisms to enforce the Cooperation Rules. The enforcement mechanisms are intended to encourage compliance, not to punish. The MLS Parties typically assess escalating sanctions in response to violations, ranging from warning letters to

one-time fines to per-day fines for violations. *See, e.g.*, Exhibit B, ARMLS Penalty Policy at 3; Exhibit D, BridgeMLS Appendix A § 2.1.1; Exhibit E, Canopy MLS Rules 8.4.3, 8.5; Exhibit G, REcolorado Rule 1.0; Exhibit H, Hive MLS Rules at 113; Exhibit J, Doorify MLS Appendix A at 8. The MLS Parties' rules also typically provide that any member who is fined or punished has certain rights to contest the sanction via a hearing and/or an appeal. *See, e.g.*, Exhibit B, ARMLS Penalty Policy at 7–17; Exhibit C, BridgeMLS Rule 15; Exhibit E, Canopy MLS Rules 8.7–8.14; Exhibit G, REcolorado Rules 8.1–8.3; Exhibit J, Doorify MLS Appendix A at 10–13.

**C. Compass**

56. Compass is the largest real estate brokerage in the United States. Founded in 2012, Compass has expanded significantly through mergers and acquisitions of competing brokerage firms. Following its acquisition of Anywhere Real Estate Inc. in January 2026, Compass now operates a brokerage business comprising approximately 83,000 agents, as well as a U.S. franchise network encompassing more than 126,000 agents.

57. Compass has consistently admitted that its size and continued growth provide it a competitive advantage in the real estate market through its control over a substantial inventory of for-sale properties. In a Q4 2024 Earnings Call on Feb. 18, 2025 CEO Robert Reffkin stated: "Depth of inventory, not breadth" is what will set Compass apart from its competitors. He went on to state: "By growing our unique inventory and marrying that with our end-to-end platform, which has agent-level search and consumer search at a level that no other brokerage firm in the industry has, we believe more and more buyers will search Compass.com and use Compass agents as it will be known that Compass has more inventory than any other website or brokerage." *See* Compass Q4 2024 Earnings Conference Call,

https://investors.compass.com/news-events/events-and-presentations/detail/20250218-q4-2024-earnings-conference-call.

58. To execute that objective, Compass has implemented a nationwide three-phased strategy consisting of the following steps. *See Zillow Grp., Inc. v. Midwest Real Est. Data LLC*, No. 1:26-CV-5451, 2026 WL 2720641, at *2–3 (N.D. Ill. Sept. 15, 2026).

a. <u>Phase 1 - Compass Private Exclusive</u>: During this phase, Compass markets the property within its own network of affiliated brokerages, agents, and their buyers while withholding the listing from the MLS and the broader cooperative marketplace. Compass promotes this phase as an opportunity for sellers to test listing prices, obtain market feedback, and generate buyer interest before marketing the property as publicly available. The Cooperation Rules allow for a Compass Private Exclusive, provided that if the broker begins public marketing of the property, it must submit the listing to the MLS within one business day.

b. <u>Phase 2 - Compass Coming Soon</u>: In phase 2, the listing moves to "Coming Soon" status and is publicly launched on Compass.com and Redfin.com but still withheld from the MLS and other competing brokerage websites and real estate portals. The listing is showcased to consumers without displaying transparency data such as days on market or price history. This phase of Compass's plan violates the Cooperation Rules because, among other things, Compass wants to selectively publicly market a property without entering it into the MLS, thus taking advantage of the cooperative without contributing to it, and depriving potential buyers of necessary transparency data on the property, including days on market and price history.

c. Phase 3 - Active on MLS and Home Search Portals: In the final phase, Compass submits the listing to the MLS, making it available for distribution to other brokerage websites and third-party real estate portals for the first time. By this stage, Compass has had the opportunity to obtain pricing feedback and other market information through Phases 1 and 2 before exposing the listing to the broader cooperative marketplace. Only upon entering this phase does the listing begin accumulating publicly displayed days on market and price reduction history through the MLS and third-party platforms.

**D. Compass Demands**

59. In September 2026, Compass sent the Demand Letters to the MLS Parties, which made substantially similar claims and demands. *See* Exhibits K (Letter to ARMLS), L (Letter to BridgeMLS), M (Letter to Canopy MLS), N (Letter to REcolorado), O (Letter to Hive MLS) & P (Letter to Doorify MLS).

60. Each letter demanded that the MLS "not fine or punish a real estate professional for publicly marketing office exclusive listings" and identified the MLS's Cooperation Rules. *See* Exhibits K–P at 1. Each letter claimed that the MLS's ban on the public marketing of office exclusive listings is a "horizontal agreement among competitors—a joint restraint adopted and enforced by competing brokers acting through the MLS" that violates antitrust law. *See* Exhibits K–P at 3. Compass argued that MLS membership is "not voluntary" but rather "a requirement of trade," and that each MLS is "controlling how real estate professionals and homeowners (who are not even members) act off of [its] platform." Exhibits K–P at 4.

61. Compass expressly stated that "[t]o avoid being named as a defendant in a federal antitrust lawsuit, [the MLS Party] must provide written confirmation" by October 6, 2026

(extended by agreement of counsel to October 20, 2026) that the MLS will not enforce its Cooperation Rules. Exhibits K–P at 1. Compass stated: "[W]e will spend millions of dollars to sue [the MLS] and other MLSs to accomplish [our] goals." Exhibits K–P at 4. Compass expressly referred to its lawsuit against Northwest Multiple Listing Service to back up this threat. Exhibits K–P at 2; *see Compass, Inc. v. Nw. Multiple Listing Serv.*, No. 2:25-cv-00766 (W.D. Wash. Mar. 19, 2026).

62. The Demand Letters were copied to the Antitrust Division of the U.S. Department of Justice and the Bureau of Competition of the Federal Trade Commission, and they included a document preservation notice, underscoring Compass's intent to pursue what it called "imminent litigation" if the MLS did not meet its demands. Exhibits K–P at 4.

63. Compass sent the Demand Letter to ARMLS on September 14, 2026. *See* Exhibit K.

64. Compass sent the Demand Letter to BridgeMLS on September 14, 2026. *See* Exhibit L.

65. Compass sent the Demand Letter to Canopy MLS on September 14, 2026. *See* Exhibit M.

66. Compass sent the Demand Letter to REcolorado on September 14, 2026. *See* Exhibit N.

67. Compass sent the Demand Letter to Hive MLS on September 14, 2026. *See* Exhibit O.

68. Compass sent the Demand Letter to Doorify MLS on September 17, 2026. *See* Exhibit P.

69. Compass's CEO also has made public statements that litigation against MLSs is imminent. These statements include a public interview on September 30, 2026, at the largest MLS trade conference, during which he stated on stage that Compass would begin filing lawsuits against MLSs over the Cooperation Rules in mid-October.

70. Compass's actions show that these are not idle threats. Compass has already filed a lawsuit against one MLS—California Regional MLS—which received a substantively identical demand letter. *See* Complaint, *Compass, Inc. v. Cal. Reg'l Multiple Listing Serv., Inc.*, No. 5:26-cv-06121 (C.D. Cal. Oct. 16, 2026), Dkt. No. 1. This lawsuit came eleven days after California Regional MLS filed a similar declaratory judgment action against Compass in this Court. *See* Complaint, *Cal. Reg'l Multiple Listing Serv., Inc. v. Compass, Inc.*, No. 1:26-CV-08796 (S.D.N.Y. Oct. 5, 2026), Dkt. No. 1. Compass also has a history of affirmative litigation, including litigation filed in this Court against Zillow and others related to the Cooperation Rules. *See Compass, Inc. v. Zillow, Inc.*, No. 25-CV-05201, 2026 WL 321084 (S.D.N.Y. Feb. 6, 2026) and *Compass, Inc. v. Nw. Multiple Listing Serv.*, 2026 WL 776138 (W.D. Wash. Mar. 19, 2026).

71. These actions reveal a consistent pattern: Compass is campaigning to restrict access to residential listings so that consumers and other brokers must go through a Compass agent just to learn about a home for sale. Compass aggressively uses the court system to effectuate that campaign.

## E. The Cooperation Rules and Antitrust Law

72. The Cooperation Rules do not violate antitrust law. Instead, they serve several important procompetitive purposes.

73. Market Transparency and Information Quality. By requiring that publicly marketed listings be promptly submitted to the MLS, the Cooperation Rules reduce hidden

inventory and improve the completeness, accuracy, and timeliness of information to provide an efficient market for all participants and consumers. This transparency benefits both buyers, who gain access to a more complete picture of available properties, and sellers, who benefit from the most efficient pricing. Sellers also benefit from the widest possible exposure for their property and greater confidence that they are getting the best price—as the Butters Report confirmed over 40 years ago. This transparency also benefits brokers representing (or seeking to represent) sellers and buyers. First, competing brokers can use the MLS's complete database to set the most accurate price and marketing plan for a property, which helps them win sellers as clients. Second, brokers representing buyers (as noted in the 2007 Competition Report) can compete effectively because they can offer access to all MLS listings and advise buyers with knowledge of nearly all available listings. Through the MLS, even a one-person brokerage can access the same listing inventory as agents at the largest brokerage and compete on the basis of service provided, rather than access to listing inventory. As a result, consumers have meaningful choices of which brokerage to hire.

74. Increased Access and Market-Enhancing Efficiencies. The Cooperation Rules increase the availability to consumers of timely, standardized listing information. As a result, more buyers see more listings, leading to better and more efficiently obtained matches between buyers and sellers and, ultimately, more completed sales.

75. Preservation of the Cooperative Product. The MLS depends on participants promptly contributing accurate listing data—like many other efficient products, it relies on the network effect of all participating brokers submitting their listings under the MLS rules. Without the Cooperation Rules, the MLS would lose value as participants increasingly withhold publicly

marketed listings, undermining its role as a comprehensive and reliable source of listing information for brokers and the consumers they serve.

76. Prevention of Free-Riding. Brokers who use MLS data to find buyers while withholding their own publicly marketed listings are free riding on other participants' contributions. The Cooperation Rules require the benefits to flow both ways: A brokerage cannot access all other brokerages' listings while refusing to share its own publicly marketed listings. For example, brokers use records of past sales and current listings in the MLS, including detailed sales information (such as closing price, marketing time, and concessions), to prepare comparative market analyses ("CMAs") for potential sellers. Brokers then use these CMAs to persuade a seller to hire them, to recommend listing prices, and to advise on timing and other aspects of the sale. The Cooperation Rules thus prevent non-cooperating brokers from profiting from the cooperative's shared information while withholding their own publicly marketed listings, which other brokers cannot then use in preparing their CMAs.

77. More Vigorous Competition Among Competing, Participating Brokerage Firms. Brokers of any size who participate in the MLS can serve any buyer because they have access to a broad inventory of properties in a service area. As a result, brokers representing buyers must compete on the quality of their services, skills, experience and, critically, on price, rather than requiring buyers to use a particular broker simply to obtain information about or access to a specific property. The Cooperation Rules also lower participating brokers' costs of matching buyers with sellers and allow them to market their services to a large pool of potential customers.

78. Protecting Consumers from Information Asymmetries and Conflicts of Interest. Withholding a property from the MLS and thus other brokers and consumers allows a listing agent to use an exclusive right-to-sell agreement to prevent competing buyer-brokers with

interested clients from accessing the listing through the MLS or contacting its seller directly. It also allows the listing agent to control advertising, marketing, and buyer leads, potentially using that control for the agent's own financial benefit at the seller's expense. In addition, where access to information or showings is conditioned on a buyer engaging the listing brokerage or abandoning existing representation, the resulting restriction can impair the buyer's choice of brokerage services.

79. Each MLS is a legitimate cooperative venture that creates a comprehensive real estate database for its respective region that no individual broker could create alone. The Cooperation Rules are necessary for the MLS to achieve its core purpose—it is the mechanism by which the database is populated with complete, timely, and accurate information. Without the Cooperation Rules, the database would be incomplete, and the cooperative enterprise would lose its value. As such, the Cooperation Rules are critical to the core purpose of the MLS, and, at a minimum, are an ancillary restraint necessary for the MLS to achieve this core purpose. The Cooperation Rules are also narrowly tailored to achieve the objective. A broker who does not wish to submit a listing to the MLS retains the freedom to keep the listing private and market it only through non-public channels.

80. The Cooperation Rules are essential to preventing free riding by brokerages who want to hoard listings for their own profit. A broker who publicly markets a property but withholds it from the MLS database is free riding on the contributions of all other members—the withholding broker uses the MLS database to find buyers for its clients and to identify properties for buyer-clients, while simultaneously denying the database the benefit of its own listings. If all brokerages were to engage in this behavior, the MLS database would become incomplete, lose its value, and ultimately collapse. Such a result would greatly impact the consumers who buy and

sell homes, not only by impairing brokers' ability to identify available properties and advise their clients, but also by reducing the quality of data relied upon by mortgage lenders, title companies, government-sponsored enterprises, and other participants in the real estate industry. The Cooperation Rules are the mechanism that prevents this outcome.

81. Importantly, the cases Compass cites to support its claims are readily distinguishable. This is not a situation where rules allegedly excluded a rival listing network from competing, *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 835–36 (9th Cir. 2022), nor is this a situation where an MLS allegedly *excluded* certain listings from the MLS in a way that allegedly discriminated against certain types of brokerages, *see Realcomp II, Ltd. v. F.T.C.*, 635 F.3d 815, 819 (6th Cir. 2011). The Cooperation Rules apply equally to all brokerages, regardless of size or business model. The rules exist to ensure transparency, access, and fair competition in the real estate brokerage market, and they prevent free riding by brokers and agents who use other brokerages' data from the MLS while hoarding their own data for their own exclusive benefit.

**COUNT I**
**(DECLARATORY JUDGMENT – SHERMAN ACT (15 U.S.C. § 1))**

82. This Count is brought by each of the MLS Parties. The MLS Parties incorporate by reference each of the foregoing paragraphs as though set forth fully herein.

83. There is an actual controversy within the jurisdiction of this Court as to whether the Cooperation Rules violate Section 1 of the Sherman Act, 15 U.S.C. § 1. Compass has explicitly threatened to bring federal antitrust claims against each of the MLS Parties on this basis and to seek treble damages. Compass has already done just this against another MLS that received a substantively identical demand letter. Thus, absent a declaration from this Court, each MLS Party will have to decide whether to continue to enforce its Cooperation Rules or face

potential antitrust litigation seeking treble damages. In addition, if any MLS Party affiliated with NAR elects to stop enforcing the Cooperation Rules, it faces potential penalties from NAR.

84. The Cooperation Rules do not violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

85. The rule of reason, not *per se* treatment, is the appropriate framework for evaluating the Cooperation Rules. Under settled law, cooperative arrangements among competitors that create a new product or service not available from individual members are not *per se* illegal. The MLS database is a product that no individual broker can create alone; it requires the collective contribution of all members. The Cooperation Rules are not a price-fixing or market allocation agreement, and they have significant procompetitive benefits—namely, they ensure the database contains the comprehensive, timely information that makes it valuable to all members, to the consumers they serve, and to the public at large.

86. The Cooperation Rules do not constitute a group boycott, as Compass has claimed. A group boycott requires an agreement to exclude competitors from the market. The Cooperation Rules do not exclude anyone from the market; they require only that participants who publicly market listings also share those listings on the MLS. Participants remain free to enter into Firm Exclusive listings with their clients or not to publicly market those listings at all. The Cooperation Rules impose no restriction on any participant's ability to compete in the real estate brokerage industry.

87. The Cooperation Rules are lawful under the rule of reason. *First*, the Cooperation Rules do not produce any anticompetitive effects. The rules do not raise prices, reduce output, exclude competitors from the market, or diminish innovation. On the contrary, the Cooperation Rules increase the output of the MLS by ensuring that publicly marketed listings are shared with

all participants, thereby expanding the pool of available properties for buyers and the pool of potential buyers for sellers. The rules do not restrict any broker's ability to compete; they simply require that brokers that wish to benefit from the cooperative's data also contribute to it. Sellers retain complete freedom to choose whether to publicly market their properties or to use "Firm Exclusive" listings. And brokers of all sizes—from sole proprietors to the largest national firms—compete in a fair and equitable marketplace because they all have access to the same comprehensive listing data. In short, the Cooperation Rules promote competition rather than restrain it.

88. *Second*, the Cooperation Rules have significant procompetitive benefits. The rules ensure the comprehensiveness and accuracy of the MLS database, which is more valuable to all members and to the public than an incomplete one. The rules prevent brokers from free-riding on the contributions of other brokers to obtain an unfair competitive advantage. The rules also promote transparency and market efficiency. By ensuring that all publicly marketed properties are in the database, the rules create a more transparent marketplace in which buyers and sellers can find each other more efficiently.

89. *Third*, no less restrictive alternative to the Cooperation Rules exists that would achieve their procompetitive objectives. The Cooperation Rules already accommodate sellers' preferences by allowing them to limit the marketing and exposure of their properties through available listing options, including Firm Exclusive and Limited Exposure listings. At the same time, the rules ensure that brokerages cannot publicly market their listings while withholding them from the cooperative marketplace and continuing to benefit from the listings contributed by other participants. Eliminating or weakening the Cooperation Rules would reintroduce the free-

rider problem, undermine the reciprocal sharing of listing information, and diminish the value of the MLS to participating brokers and the consumers they serve.

**COUNT II**
**(DECLARATORY JUDGMENT – ARIZONA UNIFORM STATE ANTITRUST ACT, A.R.S. § 44-1401 *ET SEQ.*)**

90. This Count is brought by ARMLS. ARMLS incorporates by reference each of the foregoing paragraphs as though set forth fully herein.

91. There is an actual controversy within the jurisdiction of this Court as to whether ARMLS's Cooperation Rules violate the Arizona Uniform State Antitrust Act, A.R.S. § 44-1401 *et seq*. (the "Arizona Act"). Compass has threatened antitrust litigation against ARMLS premised on the theory that the Cooperation Rules are an unlawful "horizontal agreement among competitors." Because ARMLS's Cooperation Rules govern listing and brokerage activity in Arizona, the same theory could be asserted by Compass under the Arizona Act. Accordingly, ARMLS seeks a determination of its rights under A.R.S. § 44-1402 to continue enforcing the same requirements Compass has challenged and demanded that it cease enforcing.

92. The Arizona Act provides that "[a] contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce, any part of which is within this state, is unlawful." A.R.S. § 44-1402. The Arizona Legislature has directed that the Arizona Act may be construed in accordance with federal law: "It is the intent of the legislature that in construing this article, the courts may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes." A.R.S. § 44-1412. Section 44-1402 is modeled on, and comparable to, Section 1 of the Sherman Act.

93. Applying federal interpretations of Section 1 as a guide, as A.R.S. § 44-1412 contemplates, the Cooperation Rules should be evaluated under the rule of reason because they

are internal rules of a legitimate cooperative venture that creates a product—the MLS database—no individual broker could create alone. For the same reasons set forth in Count I, ARMLS's Cooperation Rules do not violate the Arizona Act: they do not unreasonably restrain competition, they have substantial procompetitive benefits, they do not constitute an unlawful group boycott, and no reasonably available, less restrictive alternative would achieve those benefits as effectively.

94. ARMLS is entitled to a declaration that its Cooperation Rules do not violate the Arizona Uniform State Antitrust Act.

**COUNT III**
**(DECLARATORY JUDGMENT – CALIFORNIA CARTWRIGHT ACT, CAL. BUS. & PROF. CODE § 16700 *ET SEQ.*)**

95. This Count is brought by BridgeMLS. BridgeMLS incorporates by reference each of the foregoing paragraphs as though set forth fully herein.

96. There is an actual controversy within the jurisdiction of this Court as to whether BridgeMLS's Cooperation Rules violate the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.* (the "Cartwright Act"). Compass has threatened antitrust litigation against BridgeMLS, and it has already sued and brought a claim based on the Cartwright Act against another California MLS—California Regional MLS—that received a substantively identical demand letter. Because BridgeMLS's Cooperation Rules govern conduct in California, the same theory could be asserted by Compass under the Cartwright Act. Accordingly, BridgeMLS seeks a determination of its rights under the Cartwright Act to continue enforcing the same requirements Compass has challenged and demanded that it cease enforcing.

97. Claims under the Cartwright Act are analyzed under the same standard as claims under the Sherman Act. *See Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th

Cir. 2001) ("The analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq., was modeled after the Sherman Act." (citation omitted)).

98. For the same reasons set forth in Count I, BridgeMLS's Cooperation Rules do not violate the Cartwright Act. The Cooperation Rules are procompetitive rules that are lawful under the rule of reason, do not constitute an unlawful group boycott, and for which no less restrictive alternative exists.

99. BridgeMLS is entitled to a declaration that its Cooperation Rules do not violate the California Cartwright Act.

**COUNT IV**
**(DECLARATORY JUDGMENT – COLORADO STATE ANTITRUST ACT OF 2023, C.R.S. § 6-4-101 *ET SEQ.*)**

100. This Count is brought by REcolorado. REcolorado incorporates by reference each of the foregoing paragraphs as though set forth fully herein.

101. There is an actual controversy within the jurisdiction of this Court as to whether REcolorado's Cooperation Rules violate the Colorado State Antitrust Act of 2023, C.R.S. § 6-4-101 *et seq.* (the "Colorado Act"). Compass has threatened antitrust litigation against REcolorado premised on the theory that the Cooperation Rules are an unlawful horizontal restraint. Because REcolorado's Cooperation Rules govern conduct in Colorado, the same theory could be asserted by Compass under the Colorado Act. Accordingly, REcolorado seeks a determination of its rights under the Colorado Act to continue enforcing the same requirements Compass has challenged and demanded that it cease enforcing.

102. The Colorado Act provides that "[e]ntering into or engaging in any of the following in restraint of trade or commerce is illegal: (a) A contract; (b) A combination in the

form of a trust or other form of combination; or (c) A conspiracy." C.R.S. § 6-4-104. Section 6-4-104 is comparable to Section 1 of the Sherman Act.

103. For the same reasons set forth in Count I, REcolorado's Cooperation Rules do not violate the Colorado Act. The Cooperation Rules are procompetitive rules governing the internal operation of a legitimate cooperative venture, are lawful under the rule of reason, do not constitute an unlawful group boycott, and have no less restrictive alternative.

104. REcolorado is entitled to a declaration that its Cooperation Rules do not violate the Colorado State Antitrust Act of 2023.

**COUNT V**
**(DECLARATORY JUDGMENT – NORTH CAROLINA ANTITRUST LAW, N.C. GEN. STAT. § 75-1 *ET SEQ.*)**

105. This Count is brought jointly by Canopy MLS, Hive MLS, and Doorify MLS. Canopy MLS, Hive MLS, and Doorify MLS incorporate by reference each of the foregoing paragraphs as though set forth fully herein.

106. There is an actual controversy within the jurisdiction of this Court as to whether the Cooperation Rules of Canopy MLS, Hive MLS, and Doorify MLS violate N.C. Gen. Stat. § 75-1 *et seq*. Compass has threatened antitrust litigation against each of them premised on the theory that the Cooperation Rules are an unlawful horizontal restraint, and the same theory could be asserted by Compass under North Carolina law. Accordingly, Canopy MLS, Hive MLS, and Doorify MLS seek a determination of their rights under N.C. Gen. Stat. § 75-1 to continue enforcing the same requirements Compass has challenged and demanded that it cease enforcing.

107. N.C. Gen. Stat. § 75-1 provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina is hereby declared to be illegal." Section 75-1 is patterned on Section 1 of the Sherman Act.

108. For the same reasons set forth in Count I, the Cooperation Rules of Canopy MLS, Hive MLS, and Doorify MLS do not violate N.C. Gen. Stat. § 75-1. The Cooperation Rules are reasonable, procompetitive rules governing the internal operation of legitimate cooperative ventures, do not constitute a group boycott, and have no less restrictive alternative.

109. Canopy MLS, Hive MLS, and Doorify MLS are entitled to a declaration that their Cooperation Rules do not violate N.C. Gen. Stat. § 75-1 *et seq.*

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs ARMLS, BridgeMLS, Canopy MLS, REcolorado, Hive MLS, and Doorify MLS respectfully request that this Court enter judgment in their favor and grant the following relief:

A. A declaration, pursuant to 28 U.S.C. §§ 2201–2202, that the MLS Parties' Cooperation Rules do not violate Section 1 of the Sherman Act, 15 U.S.C. § 1;

B. A declaration, pursuant to 28 U.S.C. §§ 2201–2202, that ARMLS's Cooperation Rules do not violate the Arizona Uniform State Antitrust Act, A.R.S. § 44-1401 *et seq.*;

C. A declaration, pursuant to 28 U.S.C. §§ 2201–2202, that BridgeMLS's Cooperation Rules do not violate the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*;

D. A declaration, pursuant to 28 U.S.C. §§ 2201–2202, that REcolorado's Cooperation Rules do not violate the Colorado State Antitrust Act of 2023, C.R.S. § 6-4-101 *et seq.*;

E. A declaration, pursuant to 28 U.S.C. §§ 2201–2202, that the Cooperation Rules of Canopy MLS, Hive MLS, and Doorify MLS do not violate N.C. Gen. Stat. § 75-1 *et seq.*;

F. An injunction permanently enjoining Compass from bringing or pursuing any claim against any MLS Party alleging that the Cooperation Rules violate the federal antitrust laws or the state antitrust laws identified above;

G. An award of the MLS Parties' reasonable attorneys' fees and costs incurred in this action; and

H. Such other and further relief as this Court deems just and reasonable, including preliminary and temporary relief, and fees and costs as may be requested or required.

[Signature Page Follows]

This 21st day of October, 2026.

/s/ John J.D. McFerrin-Clancy
John J.D. McFerrin-Clancy
N.Y. Bar No. 2267607
jmc@mcferrin-clancy.com

**MCFERRIN-CLANCY LLC**
17 State St., 40th Floor
New York, NY 10004
Telephone: (646) 771-7377

Gregory L. Skidmore *(pro hac vice forthcoming)*
N.C. Bar No. 35571
gskidmore@rbh.com

Kevin R. Crandall *(pro hac vice forthcoming)*
N.C. Bar No. 50643
kcrandall@rbh.com

Caroline H. Reinwald *(pro hac vice forthcoming)*
N.C. Bar No. 58053
creinwald@rbh.com

Kayla E. Swan *(pro hac vice forthcoming)*
N.C. Bar No. 62698
kswan@rbh.com

**ROBINSON, BRADSHAW & HINSON, P.A.**
600 South Tryon Street, Suite 2300
Charlotte, North Carolina 28202
Telephone: (704) 377-2536
Facsimile: (704) 378-4000

*Attorneys for Plaintiffs*